The STATE of Ohio, Appellee,

v.

MAYS et al., Appellants.

[Cite as *State v. Mays* (1996), 108 Ohio App.3d 598.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 67262, 67291.

Decided Jan. 11, 1996.

600

**604**

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Stephen J. Burns, Jr.*, Assistant Prosecuting Attorney, for appellee.

*Terry H. Gilbert* and *Gordon S. Friedman*, for appellant Mays.

*Jerome Emoff*, for appellant Hailey.

JAMES M. PORTER, Judge.

Defendant-appellant Dr. David W. Mays III, in appeal No. 67262, appeals from his convictions following a jury trial for aggravated theft (R.C. 2913.02), securing writings by deception (R.C. 2913.43) and thirty-one counts of tampering with records (R.C. 2913.42) arising out of his alleged fraudulent conduct in recovering reimbursement from county welfare agencies for oral surgeries he did not perform. Defendant Mays contends that the court erred in not dismissing the charges for failure to bring him to trial within two hundred seventy days under the speedy trial statute (R.C. 2945.71[C][2] ), in not suppressing evidence obtained from his automobile in an unlawful seizure, in not excluding, *in limine*, a state audit of defendant's dental practice, and in excluding certain of defendant's evidence in his case-in-chief. Defendant Mays also contends that the evidence was insufficient to sustain the verdict, which was against the manifest weight of the evidence.

Defendant-appellant Phyllis Hailey, in appeal No. 67291, appeals from her convictions following the same jury trial in which Mays was convicted. Defendant Hailey was convicted on one count of tampering with records (R.C. 2913.42) and one count of tampering with evidence (R.C. 2921.12) arising out of her relationship with Mays. Since these were allied offenses, the state elected for the record to reflect only the tampering with evidence conviction. Defendant Hailey contends that she was also not brought to trial within two hundred seventy days in violation of the speedy trial statute, that the court erred in not suppressing evidence taken from her home without probable cause for the search warrant, and that her conviction was not sustained by sufficient evidence and was against the manifest weight of the evidence.

The appeals were consolidated for hearing and disposition by this court. For the reasons hereinafter stated, we find no merit to the appeals and affirm.

Dr. David Mays III was a dentist practicing in Shaker Heights, Ohio. On October 23, 1981, Mays executed a "Provider Agreement" with the state of Ohio which enabled him to treat welfare patients and receive payment for the services

rendered from the General Assistance Medical ("GAM") program and/or the Medicaid program. Mays was contractually "obligated to maintain such records necessary to fully disclose the extent of services provided and any information regarding payments claimed by the provider for furnishing services under the plan for a period of three years."

Early in 1990, Mays started negotiating with Dr. Kenneth Baiko concerning the possible sale of his practice to Baiko. Said sale was consummated on May 6 or 7, 1990, and Baiko began working at the dental offices thereafter. On May 10, 1990, Baiko arrived at the dental offices for a meeting with Mays. Baiko was viciously assaulted, beaten and knifed in the throat. Baiko named Mays as his assailant. Baiko also indicated that police should investigate Mays's dental practice for possible fraud. Although Mays was charged with attempted murder of Baiko in a separate case, he was ultimately acquitted by a jury verdict on October 1, 1992.

Based on Dr. Baiko's information, Shaker Heights detectives approached the Cuyahoga County Department of Human Services ("Human Services") and a joint investigation into Mays's billing practices began. Human Services was responsible for the administration of and reimbursement for GAM and Medicaid services to welfare recipients. It was discovered that Mays's invoices did not correspond with names found in an appointment book recovered from his practice. Human Services surveyed welfare recipients who were allegedly treated by Mays. Almost all of these recipients stated that they had never heard of Mays, and had not been treated by him.

The Cuyahoga County Commissioners, being advised of these developments, requested the State Auditor to audit Mays's invoices. The audit revealed that between January 1, 1987 and July 31, 1990 Mays submitted twelve thousand invoices totalling $2,718,057 for payment. The audit showed that during this time 7,159 patients were allegedly treated, but there were no patient files for 6,606 of the patients. It was determined that these patients were never treated by Mays. Four hundred sixty patient files were located, but the files did not document what services were provided. Files for ninety-three patients were found, but these files did not document all the services allegedly performed. Mays repeatedly billed for four types of high-dollar oral surgeries: gingivectomy, osseous surgery, complete bony impaction and partial bony impaction.

The defendants were indicted on May 6, 1992 and arraigned on May 20, 1992 before the Honorable Carl Character, to whom the cases were assigned. Judge Character also presided at the attempted murder trial at which Mays was found not guilty by a jury on October 1, 1992.

Following numerous pretrial conferences, the defendants filed motions to dismiss, to suppress evidence and for severance on December 17, 1992. Judge

Character set the case for trial of both defendants on January 25, 1993. On January 20, pursuant to R.C. 2701.03, the state filed an affidavit of disqualification against Judge Character with the Ohio Supreme Court. The effort to disqualify Judge Character was not ruled on by the Supreme Court until October 29, 1993, when it was denied. During the ten-month period that the disqualification matter was before the Supreme Court, there was no formal entry of a stay or a continuance of the trial. Following the Supreme Court's denial, Judge Character recused himself and the case was reassigned to the Honorable Pat Kelly.

The defendants subsequently filed motions to dismiss because they had not been brought to trial within two hundred seventy days of their arrest as required by R.C. 2945.71(C)(2). The court overruled the motions, stating that the "statute was tolled and trial court had no jurisdiction until [the] Chief Justice ruled on [the] Affidavit of Prejudice." Other motions were overruled and the case went to trial on March 23, 1994. The jury returned guilty verdicts against both defendants on April 27, 1994.

At trial, the state's dental experts testified that Mays did not have the necessary training or expertise to perform the oral surgeries for which he billed. Sometimes Mays billed for more than one procedure on the same patient on the same day. The state's experts stated that to perform all of these surgeries on a person at one time would show no concern for the patient's comfort or well-being.

The experts testified that anesthesia would be helpful in performing these surgeries, but Mays had no license to administer general anesthesia. These surgical procedures required a dental assistant. Mays's assistants testified that they had never been asked to assist in oral surgeries and that they primarily set up instrument trays and rarely entered the operatories when patients were present. Defendant's employees, with the exception of Dr. Davis, could not recall ever having seen Mays perform the high-paying procedures for which he billed.

Expert testimony also disclosed that the procedures billed were extremely time-consuming, but one dentist who worked in the office indicated that Mays rarely worked more than half a day. On cross-examination he admitted that it could have been because Dr. Mays split his time with his other dental practice. The audit revealed many days on which Mays claimed to perform in excess of one hundred services. Other discrepancies appeared: he billed for days when the office was closed, for services allegedly performed on Sundays, for services on May 10, 1990, when the Shaker Heights Police were investigating the stabbing of Dr. Baiko, and he never submitted a single invoice to Human Services after May 17, 1990, although he was still active in the practice in the summer of 1990 because he had agreed to work in the practice for a period of one year after the date it was sold to Dr. Baiko.

Eighty-nine welfare recipients, for whom invoices were submitted by Mays, appeared at trial and testified or formed the basis for a stipulation that they had never been to see Mays, or if they had, they did not receive the procedures claimed on the invoice. The invoices for these patients showed that Mays repetitively billed for the same four types of high-dollar oral surgical procedures for which he had no training and for which there were not enough hours in the day.

Defendant did not testify and never produced a single patient who could substantiate an invoice submitted.

The state was unable to establish exactly how and when Mays received information about the thousands of recipients for which he billed. However, the evidence showed that Mays enjoyed a close relationship with his codefendant, Phyllis Hailey, who managed the Payment Processing Division of Human Services, which processed the payment of dental and medical invoices. Mays's invoices were received at Human Services by hand delivery several times a month. Sometimes Mays or his office manager would personally deliver the bills.

Defendant Hailey was known to arrive at work early and place Mays's invoices on the desk of the clerk charged with processing dental claims. Mays's invoices were processed and paid every thirty-three days on the average. The average for other dentists was nine months. These expedited payments were attributed to Hailey's activities. She tracked Mays's invoices from their arrival at Human Services to their payment by the County Auditor. She would call the Auditor's Office with regularity to determine whether Mays's warrants for payment had been prepared. She frequently picked up these warrants herself. However, she also picked up warrants for a Dr. Burke and Ohio Bell Telephone. She did this despite being warned against this practice by a supervisor. Mays would also pick up warrants after Hailey had called.

Hailey bragged on one occasion that Mays was her boyfriend. She displayed jewelry to coworkers and stated that Mays had purchased it for her. She also stated on one occasion that Mays was assisting her in the purchase of an automobile.

After the May 10, 1990 attack on Dr. Baiko, Hailey was seen at a computer terminal located in the Payment Processing Division. She was printing out lists of payments made by Human Services to Mays. When asked by a coworker why she was doing this, she responded that "someone" was experiencing legal difficulties as a result of the assault. After May 10, 1990, Hailey also destroyed thousands of documents known as batch-header cards, which contained information as to whom within Human Services had processed specific invoices.

Following the convictions and sentencing, the defendants filed timely appeals, which were consolidated for disposition.

The defendants' first assignments of error will be considered together and state as follows:

"I. [Mays] The trial court erred by overruling appellant's motion to dismiss for failure to provide a speedy trial as required by the United States and Ohio Constitutions and the Ohio Revised Code."

"I. [Hailey] The trial court erred in failing to grant appellant's motion to dismiss for failure to commence trial within 270 days of arrest."

Under the speedy trial statute, R.C. 2945.71(C)(2), "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after his arrest." Both defendants Mays and Hailey were charged with felonies. The right to a speedy public trial is guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. The Ohio Supreme Court has held that "the statutory speedy trial provisions set forth in R.C. 2945.71 [are] coextensive with constitutional speedy trial provisions." *State v. King* (1994), 70 Ohio St.3d 158, 160, 637 N.E.2d 903, 905.

The Ohio speedy trial statute is constitutional, mandatory, and must be strictly construed against the state. *State v. Singer* (1977), 50 Ohio St.2d 103, 109, 4 O.O.3d 237, 240, 362 N.E.2d 1216, 1220. Once the two-hundred-seventy-day statutory limit has expired, the defendant has established a prima facie case for dismissal. *State v. Howard* (1992), 79 Ohio App.3d 705, 707, 607 N.E.2d 1121, 1122; *State v. Geraldo* (1983), 13 Ohio App.3d 27, 28, 13 OBR 29, 30–31, 468 N.E.2d 328, 330–331. At that point, the burden is upon the state to demonstrate any tolling or extension of the time limit. *State v. Howard, supra,* at 707, 607 N.E.2d at 1122; *State v. Bowman* (1987), 41 Ohio App.3d 318, 319, 535 N.E.2d 730, 731–732. A failure of the state to comply with the mandates of the Ohio speedy trial statute requires discharge of the defendant. *State v. Benson* (1985), 29 Ohio App.3d 321, 324, 29 OBR 448, 451–452, 505 N.E.2d 987, 991.

In the instant case, the defendants were indicted on May 6, 1992 and arraigned on May 20, 1992. Mays was acquitted by a jury of the attempted murder of Baiko on October 1, 1992. Judge Character presided at that trial. On December 30, 1992, a status conference was held before Judge Character in the instant case to resolve outstanding discovery issues. At this conference, the Assistant County Prosecutor asked Judge Character to recuse himself from the case because of allegations of an attempted bribe of Judge Character which came to light after the jury verdict in the attempted murder case. The Assistant

County Prosecutor threatened to file an affidavit of disqualification with the Supreme Court of Ohio if he did not comply with the request.

At the December 30 hearing, Judge Character categorically denied the allegations, refused to recuse himself, and made it clear that the trial would go forward on January 25, 1993. The state filed an affidavit of disqualification with the Supreme Court of Ohio on January 13, 1993, which was noticed to the trial court on January 20, 1993 pursuant to R.C. 2701.03. Pursuant to an App.R. 9(E) motion to supplement the record, the state has submitted a letter from the Supreme Court of Ohio to the Cuyahoga County Clerk of Courts dated January 14, 1993, with copies to Judge Character and the County Prosecutor. The letter acknowledged the affidavit of disqualification and directed that "Judge Character may not proceed with the case until the Chief Justice has passed upon the issue of disqualification." At this point in time, the trial court was without authority to proceed with substantive aspects of the case until the Chief Justice ruled on the disqualification motion. *State ex rel. Lomaz v. Portage Cty. Court of Common Pleas* (1988), 36 Ohio St.3d 209, 210, 522 N.E.2d 551, 552–553; *Bland v. Graves* (1994), 99 Ohio App.3d 123, 132, 650 N.E.2d 117, 123–124; *Evans v. Dayton Newspapers* (1989), 57 Ohio App.3d 57, 58, 566 N.E.2d 704, 705–706.

On October 29, 1993, over ten months later, the Chief Justice of the Supreme Court of Ohio issued an entry finding the affidavit of disqualification was not well taken and denied same. The Chief Justice found no evidence or information to question the ability and fairness of Judge Character to preside over the case.

Subsequent to the denial of the affidavit of disqualification, Judge Character recused himself and the case was assigned to Judge Pat Kelly. As previously noted, defendants' motions to dismiss, due to the failure of the state to commence trial within the statutory time limit, were filed and denied by the court. The case against Mays and Hailey proceeded to trial and the guilty verdicts.

The threshold issue on these appeals is whether the ten-month period during which the affidavit of disqualification was pending before the Ohio Supreme Court operated as a toll or extension of the two-hundred-seventy-day requirement. We find it did and that the speedy trial requirement was met.

The two-hundred-seventy-day period set forth in R.C. 2945.71, within which a criminal defendant must be tried, can only be tolled pursuant to the specific provisions of R.C. 2945.72, which provides:

"The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:

"* * *

"(G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such an order."

Defendants argue, as they did below, that the two-hundred-seventy-day period continued to run because no formal order was issued staying the trial. The state, at the hearing on the motion to dismiss and on this appeal, argues that the lack of a specific stay was inapplicable in the case at bar, on the theory that no formal stay was required because the filing of the affidavit of disqualification operated to bar the trial court from proceeding with the trial. We find that the trial was stayed "pursuant to an express statutory requirement" (the judicial disqualification proceedings) within the meaning of R.C. 2945.72(G). The question presented appears to be a novel one and requires analysis of the relevant statutes and authorities.

The Ohio Constitution provides that only the Chief Justice of the Ohio Supreme Court or his designee can disqualify a common pleas judge. Section 5(C), Article IV of the Ohio Constitution states as follows:

"The chief justice of the supreme court or any judge of that court designated by him shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof. Rules may be adopted to provide for the hearing of disqualification matters involving judges of courts established by law."

The General Assembly has implemented the constitutional provision by expressly addressing the disqualification of common pleas court judges. R.C. 2701.03 states as follows:

"When a judge of the court of common pleas is interested in a cause or matter pending before the court, is related to, or has a bias or prejudice either for or against, a party to a matter or cause pending before the court or his counsel, or is otherwise disqualified to sit in a cause or matter pending before the court, any party to the cause or matter, or the counsel of any party may file an affidavit with the clerk of the supreme court setting forth the fact of the interest, bias, prejudice, or disqualification. The clerk of the supreme court forthwith shall forward the affidavit to the chief justice of the supreme court and notify the clerk of the court of common pleas, and the clerk of the court of common pleas shall enter the fact of the filing on the trial docket in the cause. The chief justice, or any judge of the supreme court designated by him, shall pass upon the disqualification of the judge pursuant to Section 5(C) of Article IV, Ohio Constitution. If the chief justice, or any judge of the supreme court designated by him, finds that the judge is disqualified, the court of common pleas of which the disqualified judge is a member, or the chief justice, or any judge of the supreme court designated by him, if the disqualified judge is the only judge of the court of

common pleas, shall assign the cause or matter to another judge. The judge so assigned shall try the matter or cause. The affidavit shall be filed not less than three days prior to the time set for the hearing in the matter or cause."

Given this required procedure, the case law is clear that once an affidavit of disqualification is filed with the Supreme Court, the trial court is powerless to proceed with the matter until the Supreme Court rules on the disqualification. This court analyzed the effect of the filing in *Cuyahoga Bd. of Mental Retardation v. Assn. of Teachers* (1975), 47 Ohio App.2d 28, 35–36, 1 O.O.3d 168, 172–173, 351 N.E.2d 777, 783–784, stating:

"But the 'mere filing' of such an affidavit does have at least a temporary effect; it deprives the trial judge of the power to proceed on the case until such time as the affidavit of disqualification has been ruled upon by the Chief Justice of the Supreme Court. This rule was first set forth by the Supreme Court in the case of *Wolf v. Marshall* (1929), 120 Ohio St. 216 [165 N.E. 848]. * * *

"In the *Wolf* case the trial judge held that the affidavit of prejudice filed against him was not timely, and proceeded to try the case. On appeal the issue presented to the court was whether the trial court could proceed with the trial prior to the determination of disqualification by the Chief Justice of the Supreme Court. In reversing the judgment, the court held that upon these facts '[t]he trial judge was without authority * * * to proceed with the trial and enter judgment therein * * *' and as a consequence the judgment was a 'nullity' and had to be reversed and remanded. *Wolf, supra,* at 219–220 [165 N.E. at 849].

"Similarly, in *Tumbleson v. Noble* (1959), 109 Ohio App. 242, 244 [10 O.O.2d 470, 471, 164 N.E.2d 808, 810], the Court of Appeals summarized what it termed the 'well established rule' upon this issue:

" ' * * * so long as the affidavit of prejudice is on file, and the issue of disqualification thereby raised remains undecided, the judge is without authority to determine the cause or hear any matter affecting the substantial rights of the parties.' " Accord *Wendel v. Hughes* (1940), 64 Ohio App. 310, 18 O.O. 120, 28 N.E.2d 686.

Simply stated: "Once a party files an affidavit of prejudice, the trial judge does not have the power to proceed with the case until the Chief Justice of the Supreme Court has ruled on the affidavit." *Cleveland v. White Properties, Inc.* (1985), 28 Ohio App.3d 37, 38, 28 OBR 47, 48, 501 N.E.2d 1231, 1233. "Every act of the trial judge subsequent to the filing of the affidavit was fatally defective." *Walker v. Stokes* (1977), 54 Ohio App.2d 119, 123, 8 O.O.3d 237, 240, 375 N.E.2d 1258, 1261.

Under the circumstances of this case, it is clear that the trial judge was powerless to proceed with the trial of the case until the Supreme Court resolved

the prejudice proceedings. This was therefore "[a]ny period during which trial is stayed pursuant to an express statutory requirement." The express statutory requirement was that the Chief Justice was obliged to rule on the affidavit of disqualification under the Ohio Constitution and the statutory provisions of R.C. 2701.03 which implemented it. In reaching this conclusion and construing the intent of the legislature, we are also guided by the fact that Section (G) also makes specific reference to: "*or* pursuant to an order of another court of competent jurisdiction." (Emphasis added.) The requirement of a stay is in the disjunctive and a formal order from the Supreme Court is not necessary when an express statutory requirement is applicable.

Defendants' argument that the stay language must be actually contained in the statute to operate as an express statutory requirement is contrary to *State v. Spratz* (1979), 58 Ohio St.2d 61, 12 O.O.3d 77, 388 N.E.2d 751, in which the defendant entered a plea of not guilty by reason of insanity. Pursuant to R.C. 2945.37, the trial court was compelled to refer the defendant for psychiatric examination, thereby adding thirty-five days to the delay of the trial and exceeding the two-hundred-seventy-day speedy trial period. The statute made no express reference to a stay. In reversing this court, the Supreme Court held that the period of psychiatric reference operated to toll the two-hundred-seventy-day period and was, under R.C. 2945.72(G), "[a]ny period during which trial is stayed pursuant to an express statutory requirement." *Id.* at 64–65, 12 O.O.3d at 78–79, 388 N.E.2d at 754.

The cases on which defendants rely are neither dispositive nor persuasive. In *State v. Wallace* (Nov. 2, 1990), Green App. No. 90–CA–02, unreported, 1990 WL 166980, the defendant filed an affidavit of disqualification and the Supreme Court issued an order staying the trial. The court of appeals found that the speedy trial time was stayed by order of the Supreme Court and did not address the circumstance when no formal stay is issued. The *Wallace* case did not address the tolling of defendant's speedy trial time by virtue of an "express statutory requirement" which is at issue here.

In *Rife v. Morgan* (1995), 106 Ohio App.3d 843, 667 N.E.2d 450, the case did not deal with the speedy trial issue at all. It was concerned in a civil context with whether the trial court is deprived of jurisdiction when an affidavit of disqualification is filed. The court of appeals took issue with the well-established case law in this district interpreting R.C. 2701.03 to provide that, once an affidavit of disqualification is filed, the court is divested of jurisdiction to act further in the matter. We do not find reason to depart from our previous decisions or to follow the dubious distinctions made in *Rife.*

Thus, the affidavit of disqualification operated to toll or extend the two-hundred-seventy-day period while the Chief Justice had the matter under consid-

eration. It was not necessary that a journal entry of continuance or order tolling the period be entered in view of the "express statutory requirement" compelling the disqualification procedures.

Defendants' Assignment of Error I is overruled.

Since the remaining assignments of error are unique to each defendant, we will address them separately.

### Mays's Appeal No. 67262

"II. The trial court erred in overruling appellant's motion to suppress evidence obtained as a result of the illegal seizure of appellant's automobile denying appellant rights guaranteed by the Fourth Amendment of the United States Constitution."

■ On August 16, 1990, Mays's personal residence located at 3018 Kingsley Road, Shaker Heights, Ohio was searched pursuant to a search warrant based on allegations of defendant's attempted murder of Baiko and welfare fraud. Defendant does not challenge the validity of the search warrant for the home, but does assert error in the officer's seizure of defendant's automobile.

During the search of the Kingsley residence, Mays arrived on the scene and parked his car on the street some distance from his home. One of the detectives walked down to the car and observed through the driver's side window a jacket which fit the description of the jacket worn by Baiko's assailant on May 10, 1990. The detective sought consent to search the vehicle from Mays and his attorney, which was denied. The detective contacted the Cuyahoga County Prosecutor's Office, seeking guidance. Subsequently, the vehicle was seized and towed to the Shaker Heights evidence garage. It was kept there until a search warrant specifically describing the vehicle and items sought was presented and authorized by the common pleas court on August 17, 1990. Among the items seized from the car were two receipts, one a Federal Express invoice and the other a postal card, both bearing the name of Phyllis Hailey, which items defendant Mays sought to suppress.

In overruling the motion to suppress, the trial court, in its written opinion of April 7, 1994, reasoned as follows:

"The exigency of the circumstances justified the impounding of the vehicle. *Carroll v. U.S.* (1925), 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543]. It is well known that the opportunity to search a car is fleeting since a car is readily movable. *Chambers v. Maroney* (1970), 399 U.S. 42 [90 S.Ct. 1975, 26 L.Ed.2d 419]. The immobilization of the car was permissible until the search warrant was obtained. *Chambers,* 399 U.S. at 51 [90 S.Ct. at 1981, 26 L.Ed.2d at 428]. The search

warrant having been obtained the search was properly conducted and the evidence seized therefrom will not be suppressed."

Defendant Mays argues that the search warrant issued for the house did not include the car parked on a public street. With this we agree, but that does not resolve the issue.

It is a fundamental tenet of constitutional law that a warrantless search or seizure is *per se* unreasonable and thereby violative of the Fourth Amendment, unless it falls within one of the specifically established exceptions to the warrant requirement. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585; *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576. In the case herein, we find that an automobile exception exists and applies to the facts before us.

■ The Ohio Supreme Court in *State v. Mills* (1992), 62 Ohio St.3d 357, 367, 582 N.E.2d 972, 982, citing relevant United States Supreme Court case law, defined the automobile exception as follows:

"The well-established automobile exception allows police to conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence that is subject to seizure, and exigent circumstances necessitate a search or seizure. *Chambers v. Maroney* (1970), 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428; *Carroll v. United States* (1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. The mobility of automobiles often creates exigent circumstances, and is the traditional justification for this exception to the Fourth Amendment's warrant requirement. *California v. Carney* (1985), 471 U.S. 386, 391, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406, 413."

The United States Supreme Court has stated that the justification for the automobile exception comes into play only "when a vehicle is being used on a highway, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes." *California v. Carney* (1985), 471 U.S. 386, 393, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406, 414; *State v. Roaden* (1994), 98 Ohio App.3d 500, 504, 648 N.E.2d 916, 919.

The facts of this case satisfy the automobile exception. Defendant's automobile was parked on a public street. The officer had probable cause to believe that the vehicle contained material evidence, as in plain view on the back seat was a jacket matching the description of the jacket worn by Baiko's assailant. Exigent circumstances necessitated the seizure, as defendant was alerted to the fact that the detectives were going to search his vehicle, as they asked his permission to do so. If the detectives were to leave the automobile while obtaining a warrant, defendant could have driven off and hidden the vehicle or disposed of any incriminating evidence. In fact, pursuant to the automobile exception, the

officers were under no duty to seize the car and then obtain a search warrant. They could have searched the vehicle since they had probable cause to believe that important evidence was in the car. As the Supreme Court held in *Chambers v. Maroney, supra,* 399 U.S. at 51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the greater and which is the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

The search of defendant Mays's vehicle was not in violation of his constitutional rights. The trial court was correct in overruling the motion to suppress.

■ Even if the seizure of the automobile was illegal, the items are not sufficiently incriminating to require a reversal of the conviction. The Federal Express receipt and postal card found in Mays's car merely showed that Hailey and Mays knew each other. At trial there was more than sufficient evidence besides these items to show that Hailey and Mays knew each other. Ms. Hall, the former director of Human Services, testified that she recalled that Hailey had told her that she was friends with Mays. Hailey's former secretary testified that Mays would call Hailey at work a couple times a week and that Hailey had told her that Mays had bought her a pin and bracelet and was going to assist Hailey in purchasing a car. Mr. Harris, the fiscal officer at Human Services, testified that Hailey told him that Mays was her boyfriend. Due to this evidence of Mays's and Hailey's friendship, we cannot say the admission of the mail receipts, if the product of an illegal seizure, constituted reversible error.

■ The Ohio Supreme Court in *State v. Brown* (1992), 65 Ohio St.3d 483, 485, 605 N.E.2d 46, 47–48, held:

"In making a Crim.R. 52(A) harmless error analysis, any error will be deemed harmless if it did not affect the accused's 'substantial rights.' Otherwise stated, the accused has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free from all error. Before constitutional error can be considered harmless, we must be able to 'declare a belief that it was harmless beyond a reasonable doubt.' *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 711. Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and there will not be grounds

for reversal. *State v. Lytle* (1976), 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623, paragraph three of the syllabus, vacated on other grounds in (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

" * * *

" 'In a criminal prosecution, the allegedly erroneous admission in evidence of items unlawfully seized is harmless beyond a reasonable doubt and does not provide grounds for reversal of the conviction where the pertinent testimony of witnesses at the trial is not the product of such seizure and is overwhelmingly sufficient to independently establish the elements of the offense beyond a reasonable doubt.' *Tabasko, supra,* at syllabus."

In the case herein, testimony at trial, which was not the product of the seizure of the automobile, sufficiently established a relationship between Mays and Hailey. Furthermore, Hailey was found not guilty of aiding and abetting Mays in his fraud, but only found guilty of tampering with evidence by disposing of the batch-header cards. At best, the postal receipts found in Mays's car were cumulative evidence of the relationship and did not contribute to Mays's conviction.

This assignment of error has no merit and is overruled.

"III. The trial court erred in denying appellant's motion in limine to exclude testimony regarding a state audit of appellant's former business.

"IV. The trial court erred in excluding relevant defense evidence thereby denying appellant his right to due process guaranteed by the Fifth Amendment to the United States Constitution."

We will treat these assignments of error together as the standards for the admission or exclusion of evidence are equally applicable.

The admission and exclusion of evidence are within the broad discretion of the trial court. A reviewing court should be slow to interfere unless the court has clearly abused its discretion and a party has been materially prejudiced thereby. *Shimola v. Cleveland* (1992), 89 Ohio App.3d 505, 511, 625 N.E.2d 626, 629–630. See, also, *State v. Simmons* (1989), 61 Ohio App.3d 514, 517, 573 N.E.2d 165, 166–167; *State v. Bresson* (1990), 51 Ohio St.3d 123, 129, 554 N.E.2d 1330, 1335; *State v. Finnerty* (1989), 45 Ohio St.3d 104, 109, 543 N.E.2d 1233, 1238; *State v. Miller* (July 28, 1994), Cuyahoga App. No. 65929, unreported, at 2, 1994 WL 393684. An abuse of discretion is more than a mere error of judgment or of law; rather, it is conduct that is arbitrary, capricious, unreasonable, or unconscionable. *State v. Moreland* (1990), 50 Ohio St.3d 58, 61, 552 N.E.2d 894, 898–899; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173,

404 N.E.2d 144, 148–149; *Quellos v. Quellos* (1994), 96 Ohio App.3d 31, 42, 643 N.E.2d 1173, 1180–1181.

Defendant argues that the audit and testimony of the Assistant State Auditor who conducted it should have been excluded because the audit was unreliable. Defendant reasons that the chain of custody of the patient files was interrupted by the sale of the practice to Baiko in 1990, and that the Assistant State Auditor assigned to the case was unqualified to perform the audit investigation. Chain of custody objections go to the weight of the evidence not to its admissibility. *State v. Richey* (1992), 64 Ohio St.3d 353, 360, 595 N.E.2d 915, 922–923; *State v. Blevins* (1987), 36 Ohio App.3d 147, 521 N.E.2d 1105.

As this court held in *In re Lemons* (1991), 77 Ohio App.3d 691, 693, 603 N.E.2d 315, 317:

"The state bears the burden of establishing the proper chain of custody; however, it is not an absolute duty. *State v. Moore* (1973), 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268, 353 N.E.2d 866, 870. In order to meet its burden, the state need only prove that it is 'reasonably certain that substitutions, alteration or tampering did not occur.' *Id.* * * * Moreover, a chain of custody can be established by direct testimony or by inference. *State v. Conley* (1971), 32 Ohio App.2d 54, 60, 61 O.O.2d 50, 54, 288 N.E.2d 296, 300. The issue of whether there exists a break in the chain of custody is a determination left up to the trier of fact. *Columbus v. Marks* (1963), 118 Ohio App. 359, 25 O.O.2d 228, 194 N.E.2d 791. Any breaks in the chain of custody go to the weight afforded to the evidence, not to its admissibility. *Id.*"

There was ample evidence from which the jury could judge the reliability of the chain of custody.

Defense counsel presented evidence that Mays turned over the practice to Baiko in May 1990, that Baiko was in charge of the office at the time the records were subpoenaed, and that Baiko had a motive to tamper with the files as he was suing Mays. Defense counsel also presented evidence that the detectives went through the records, organized them alphabetically and stored them in the Justice Center basement storage facility.

The state, on the other hand, presented evidence showing that Mays was required to remain with the office for one year after transferring the practice to Baiko. Detective Ward testified at length regarding the manner in which the patient files were identified, collected, and conveyed to the audit team. Pending trial, the files were stored under lock and key in the basement of the Justice Center. Given the evidence presented, the jury could adequately determine the integrity of the audit records. Therefore, we find no merit to defendant's chain of custody argument.

██ The attack on the Assistant State Auditor's credentials is likewise without merit. Assistant State Auditor Ruth Popovich testified extensively as to her qualifications to perform the special audit of Human Services payments to Mays. Popovich had more than seventeen years of experience with the State Auditor's Office. She had conducted numerous audits and had recently been promoted from Assistant State Auditor to Audit Supervisor and became a Certified Fraud Examiner.

In permitting Popovich to testify, the trial court recognized her experience when he ruled:

"Well, I've heard the arguments. It's the same arguments I heard when I had to rule on the audit. And I think she meets the qualifications, and I'm going to let her testify. I think she testified that she's done hundreds of audits. She testified this audit was comparing vouchers, public payments. She's done that before. I think she testified as to that. There's lots of case law about that, too, about State Auditors testifying. So, I'm going to allow her to testify."

The trial court's ruling was well within its discretion and will not be disturbed. We note the defendant's retained expert testified at trial that the audit was "very reliable" with respect to its objective.

██ We also disagree with defendant's arguments that the audit and the testimony which flowed from it did not assist the jury, that its prejudice outweighed its probity, and that it did not depict a violation of clearly defined procedures.

The essence of the theft charges against defendant Mays was that he billed for services on patients that he had never treated, and grossly overbilled for patients that had been to his office. The auditor's findings were based in part upon the lack of back-up documentation to support the services billed in the invoices he submitted for payment. The lack of documentation was highly relevant in proving whether defendant committed theft by deception (R.C. 2913.02[A][3] ), or secured writings by deception (R.C. 2913.43). Based on a lack of documentation, a factfinder was entitled to infer that the patient was never seen or treated by defendant Mays. The state corroborated the Auditor's findings by showing that the lack of documentation was because the overwhelming majority of the patients for whom defendant billed had never been to his office.

Defense counsel had the audit report for over a year prior to trial. Defendant's expert was given complete access to the back-up material that the State Auditor's Office used in making its findings. The defense expert concluded that the audit was "very reliable with respect to the objective that it had meaning what it was designed to do, and that was to determine whether or not there were patient files that supported the billings." The weight to be given such evidence

was primarily for the trier of fact. *State v. DeHass* (1969), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

Defendant Mays also contends that the Provider Agreement which required him to maintain patient records was vague and ambiguous. There is no merit to this contention. The Provider Agreement required that the provider "maintain such records necessary to fully disclose the extent of services provided and any information regarding payments claimed by the provider for furnishing services under the plan for a period of three years." The absence of any patient files to match the invoices submitted could be deemed to violate these record keeping requirements.

Defendant submits that the factfinder might have confused civil liability with criminal culpability based upon the audit findings. That risk was appropriately avoided by the trial court's detailed instructions in this regard which eliminated . possibility of confusion. These instructions were agreed to by defense counsel and read to the jury at the conclusion of the auditor's testimony, and again during the final charge. The jury is presumed to follow the court's instructions. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 8–9; *Pang v. Minch* (1990), 53 Ohio St.3d 186, 195, 559 N.E.2d 1313, 1321–1322; *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1245–1247.

The trial court's decision to admit the audit report and testimony of the special Auditor was not an abuse of discretion.

Defendant Mays's Assignment of Error IV addresses the exclusion of certain evidence offered in his case-in-chief. This evidence was proffered through the testimony of the Chief of the Welfare Fraud Control Unit of the Ohio Department of Human Services and a private investigator retained by defendant Mays. The admission or exclusion of this evidence was also a matter within the trial court's discretion.

Defendant subpoenaed Darlene Hawkins, Chief of the Bureau of Fraud Control for the Ohio Department of Human Services, to testify. On voir dire, out of the presence of the jury, she conceded that she dealt mainly with fraud involving federal programs, like Aid to Dependent Children ("ADC") and food stamps. She did not investigate abuse of medical cards. Her primary focus was the investigation of trafficking in food stamps. She stated that she received reports from Cuyahoga County which concerned the screening of applicants for ADC. The earliest report in her possession was for September 1993, which postdated by three years any evidence relating to Dr. Mays's activities. It was within the trial court's discretion to exclude this testimony because the instant case had to do with vendor/supplier fraud, not the fraud of individual welfare recipients. Her testimony would have been irrelevant and confusing.

The next defense witness whose testimony was excluded by the trial court was a private investigator named Al Hill who allegedly obtained a false medical card and passed it off to a local dentist on or about October 8, 1990.

The fact that it might be possible to procure and pass false identification onto a dentist other than Dr. Mays would have minimal relevance to the case at bar. The key issue was whether Mays received reimbursement for patients he did not treat and services he did not perform, not whether an individual patient could have deceived him or some other dentist from time to time. Such evidence would still not account for having no patient files. The defense never called Mays's employees who might have shed light on the procedures for admitting patients for treatment. We see no abuse of discretion in excluding the Hill testimony.

The defense also sought the introduction of a videotape containing excerpts from a series of WEWS TV–5 news stories relating to welfare fraud which aired in November 1993. In ruling against the admission of this tape after viewing it, the court noted that it was not "competent evidence in the case of theft. * * * I don't think they have any way of cross-examining those folks. * * * It's a bunch of news reports with folks who cannot be cross-examined about the circumstances of it, and none of them talked about using medical benefits either, so I just don't think it's relevant." The tape was rank hearsay as well as irrelevant and confusing. No abuse of discretion occurred in excluding it.

For the reasons hereinbefore stated, defendant Mays's Assignments of Error III and IV are overruled.

"V. The evidence is legally insufficient to support a verdict of guilty for the offenses charged.

"VI. The appellant's conviction is against the manifest weight of the evidence."

The standard of review with regard to the sufficiency of evidence is set forth in *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus:

"Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." See, also, *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394, 399; *State v. Davis* (1988), 49 Ohio App.3d 109, 113, 550 N.E.2d 966, 969. *Bridgeman* must be interpreted in light of the sufficiency test outlined in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, in which the Ohio Supreme Court held:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" See, also, *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623, 634–635.

When the argument is made that the conviction was against the manifest weight of the evidence, the appellate court is obliged to consider the weight of the evidence, not its mere legal sufficiency. The defendant has a heavy burden in overcoming the factfinder's verdict.

As this court has stated:

"The weight to be given evidence and the credibility of witnesses are determinations to be made by the triers of fact. *State v. Thomas* (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356. If there was sufficient evidence for the triers of fact to find a defendant guilty beyond a reasonable doubt this court will not reverse a guilty verdict based on manifest weight of the evidence. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph four of the syllabus, certiorari denied (1989), 489 U.S. 1040, 109 S.Ct. 1177, 103 L.Ed.2d 239." *State v. Rios* (1991), 75 Ohio App.3d 288, 291, 599 N.E.2d 374, 376. See, also, *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503.

R.C. 2913.02 defines "theft by deception" as follows:

"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

" * * *

"(3) by deception."

Pursuant to R.C. 2913.01:

"(A) 'Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

In claiming that the evidence was insufficient, defendant argues that the "irregularities" in his billing procedures were not directly attributable to him. Nevertheless, he concedes that he negotiated and deposited all monies generated by the invoices. Defendant reasons that because no one saw him personally draw up the false invoices and no one testified to being directed to create a false bill on his behalf, that no "overt" act of deception was proven and he was therefore unfairly convicted of theft "by deception." We find no merit in this contention.

The state offered sufficient evidence, if believed by the jury, to establish beyond a reasonable doubt that Mays submitted bills for work which was never performed. Submitting millions of dollars' worth of invoices for services where the defendant knew that the services claimed on the invoices were not performed is an act of deception clearly contemplated by the statute under which Mays was convicted.

At trial, the state's evidence showed that Mays was reimbursed for thousands of procedures that were never performed. Evidence included the following facts: out of the 7,159 patients allegedly treated, 6,606 patient files were nonexistent; patients for whom he received payment testified that they had never been to Mays's office; dental experts stated that Mays was unqualified to perform the high-dollar oral surgeries billed for; evidence showed that there was not enough time in the day to do the procedures he claimed to have done; billings were repetitive and duplicative in nature based on procedures and tooth numbers; and Mays's appointment book showed little correlation to his billings. This evidence was sufficient to support the jury's finding that defendant Mays was guilty of theft by deception.

Defendant's arguments going to the manifest weight of the evidence are simply attacks on the credibility of the state's witnesses. Their testimony and its credibility were for the jury to weigh and determine. We will not disturb their verdict on the sufficiency or the weight of the evidence.

Defendant Mays's Assignments of Error V and VI are overruled.

Defendant Mays's conviction is affirmed.

### Hailey Appeal No. 67291

"II. The trial court and issuing magistrate did not have a substantial basis for concluding that probable cause existed for the search of appellant's home, and, therefore, the trial court erred in overruling appellant's motion to suppress physical evidence."

Defendant Hailey argues that the search warrant pursuant to which the Sheriff's office conducted a search of Hailey's residence at 17212 Eldamere Road, Cleveland, Ohio on August 30, 1990 was not valid. She primarily contends that

the affidavit for the search warrant failed to support probable cause for its issuance. We find no merit to this argument.

In *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court stated that the proper analysis to be used to determine whether probable cause exists for the issuance of a search warrant is one of "the totality of the circumstances."

The Ohio Supreme Court has followed the United States Supreme Court by stating as follows in *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraphs one and two of the syllabus:

"In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates* [1983], 462 U.S. 213, 238–239 [103 S.Ct. 2317, 2332–2333, 76 L.Ed.2d 527, 548–549], followed.)

"In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant. (*Illinois v. Gates* [1983], 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527], followed.)" See, also, *State v. Miller* (Apr. 1, 1993), Cuyahoga App. No. 62192, unreported, at 4, 1993 WL 95532; *State v. Colon* (Oct. 14, 1994), Cuyahoga App. Nos. 66985, 66986 and 66987, unreported, at 2, 1994 WL 568307.

The affidavit provided in support of the search warrant specified nine items to be seized and provided twenty-seven facts which formed the basis for the request to search Hailey's residence. The fact that they were based upon hearsay or other "leads" upon which law enforcement officials customarily operate is not grounds for questioning probable cause, provided that there is a substantial basis for believing the source of the hearsay is credible and that there

is a factual basis for the information furnished. Crim.R. 41(C); *State v. Tomko* (Aug. 24, 1995), Cuyahoga App. No. 68161, unreported, 1995 WL 502553.

In determining the validity of a search warrant, the only question is whether the total facts presented to the issuing magistrate are sufficient to support the determination that probable cause exists. *State v. Garner* (1995), 74 Ohio St.3d 49, 62, 656 N.E.2d 623, 636; *State v. Taylor* (1992), 82 Ohio App.3d 434, 442, 612 N.E.2d 728, 732. We find the issuing magistrate below had sufficient grounds to find probable cause to issue the search warrant given the surrounding circumstances. The factual paragraphs of the affidavit (one through nineteen) established the fraudulent nature of Mays's practice and defendant Hailey's involvement with it. These included allegations that between 1985 and 1990 Mays was paid $4.3 million by Human Services for services allegedly performed; Mays had an inadequate number of assistants to generate such billings; names on invoices were not reflected in an appointment book recovered from Mays's office; high-dollar procedures performed on the same tooth numbers, but on different patients, were repetitively billed; a large number of patients for whom bills had been submitted indicated that they had never been treated by Mays.

The "link" between Mays's "practice" and defendant Hailey was set forth. Mays's invoices were paid through the Payment Processing Department of Human Services. Hailey was the manager of this department. Hailey had admitted to knowing Mays. She had admitted to personally bringing his invoices to the Human Services offices and collecting the vouchers from the Cuyahoga County Auditor's Office. At the time the affidavit was submitted, the investigation revealed that Hailey had secured the payment of forty-seven vouchers for Mays from the Auditor, amounting to $150,000. Hailey's acts were outside the scope of her employment and resulted in her termination from Human Services.

Taken in its entirety, the affidavit of the sheriff's detective showed a probability that a fraudulent criminal enterprise had been in operation for several years in which Mays, with the collaboration of Hailey, received overpayments of public monies for services never performed. Proof of the crime depended on access to the records maintained and monies paid. The affidavit requested that items to be seized from Hailey's residence included Human Services' records, Mays's dental records, Hailey's personal financial statements, typewriters, computers or software, and other items which would be necessary to perpetrate a white-collar crime of the magnitude alleged. Hailey's personal residence was a likely repository for the items which the police were seeking and a "fair probability" existed that these items would be found in Hailey's home. *State v. George, supra,* 45 Ohio St.3d 325, 544 N.E.2d 640, at paragraph one of syllabus. Hailey

had previously admitted to police that she brought Mays's invoices to work and collected warrants for payment to Mays outside the scope of her employment.

We are mindful of our obligation to "accord great deference to the magistrate's determination of probable cause" under *Gates* and *George, supra.* Given the "totality of the circumstances" standard, the magistrate made a practical, common-sense decision that there was a fair probability that relevant evidence would be found at Hailey's residence. A substantial basis existed for concluding that there was probable cause for issuing the search warrant.

Hailey's Assignment of Error II is overruled.

"III. The evidence was insufficient to sustain a conviction and/or the verdict was not supported by sufficient evidence and/or the verdict was against the manifest weight of the evidence."

We will not repeat the legal standards which govern our review of the sufficiency or manifest weight of the evidence.

Defendant was found guilty of tampering with evidence. Pursuant to R.C. 2921.12, "tampering with evidence" is defined as:

"(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

"(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

The evidence at trial was more than sufficient to support the charge under this statute.

Cassandra Richardson, Finance Director of Human Services during the relevant period, testified extensively on the policies and procedures governing the agency. Richardson described the essential and confidential information contained on the "batch-header card," a document created by the Payment Processing Department which defendant Hailey supervised. This information included a schedule number, index and fund number, object code, amount paid, number of invoices per batch, number of vendors per batch, date processed, and the name of the Human Services account clerk who processed a particular batch of invoices. The value of this record was explained to be that it could be used to check for errors, and identify which Human Services employee had processed certain invoices. Richardson testified that there was no policy within Human Services which permitted the destruction of batch-header cards, although there was also no policy prohibiting it.

Joyce Bugg testified that she was an Account Clerk II in the Payment Processing Department during Hailey's tenure as manager. According to Bugg,

between the years 1986–1990, all batch-header cards were given to defendant Hailey who retained them in her office. Hailey had verbally instructed employees on this retention policy which was the custom within the department.

Bugg further testified as to two events which occurred between May 10, 1990 and June 15, 1990. She was certain of this time frame—being the dates, respectively, of her birthday and her son's birthday. The first event occurred at a computer terminal in the Payment Processing Department. Bugg saw Hailey printing out Mays's vendor file, which included a payment history. When she asked Hailey why she was doing this, Hailey responded "someone needed it because they needed to determine how much money Dr. Mays had received because of some type of legal problem he was in." The legal problem had arisen because "someone had been hurt in his office." During the same time frame but after the computer terminal episode, Bugg witnessed Hailey's destruction of all of the batch-header cards (thrown into wastebaskets) which had been stored in her office between the years 1986 and 1990.

This evidence sufficiently shows that Hailey was aware that an investigation of Mays was in progress, as she told Bugg that Mays was in some sort of legal trouble. However, in spite of this knowledge, Hailey threw out all the batch-header cards in her possession, thereby making it unavailable to the investigators. This evidence supports the elements defined in R.C. 2921.12.

Defendant also argues that the batch-header cards were a redundant record, as a log book existed and, as such, held little value to the investigation. The law does not give criminals credit for failing to destroy all documents which may provide inculpatory evidence. The batch-header cards contained valuable information, the loss of which handicapped investigators in testing the legitimacy of the work being performed within Human Services because of Hailey's acts.

We find that the evidence was sufficient to sustain the jury's conviction against defendant Hailey. We do not find any merit to defendant's contention that her conviction was against the manifest weight of the evidence.

Defendant Hailey's Assignment of Error III is overruled.

Defendant Hailey's conviction is affirmed.

*Judgments affirmed.*

SPELLACY, P.J., and O'DONNELL, J., concur.