DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Ryan M. Gaines, appeals from his conviction in the Wayne County Court of Common Pleas for complicity to commit aggravated robbery and complicity to commit theft. We affirm.
 I. {¶ 2} On April 22, 2004, Appellant was indicted on the following: (1) one count of complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(1), a first-degree felony; (2) one count of complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(3), a first-degree felony; (3) one count of complicity to commit aggravated robbery, in violation of R.C. 2911.02(A)(2), a second-degree felony; (4) one count of complicity to commit theft, in violation of R.C.2913.02, which amount exceeded $500 but was less than $5,000 in value, a fifth-degree felony, see R.C. 2913.02(B)(2); and (5) one count of complicity to disrupt public services, in violation of R.C. 2909.04(A)(1), a fourth-degree felony. These charges stemmed from an aggravated robbery and theft that occurred at the Family Dollar Store in Orrville, Ohio. Appellant pled not guilty to the charges. Co-defendant James Garrett ultimately provided a confession to law enforcement regarding the incident, was convicted of aggravated robbery, theft, and disrupting public services, and at the time of Appellant's trial was serving a prison sentence. He also testified on behalf of the State in the trial against Appellant.
 {¶ 3} The matter concerning Appellant's case proceeded to a jury trial. Prior to submitting the case to the jury, the court entered a judgment of acquittal on the disrupting public services charge. In addition, the State moved to dismiss complicity to commit aggravated robbery as charged in counts two and three in the indictment. A jury found Appellant guilty of complicity to commit aggravated robbery as charged in count one and complicity to commit theft as charged in count four. The trial court sentenced Appellant accordingly. This appeal followed.
 {¶ 4} Appellant timely appealed, asserting four assignments of error for review. We address Appellant's second and fourth assignments of error together, and we address these assignments of error first.
 II. A. Second Assignment of Error
"THE TRIAL COURT ERRED IN DENYING APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQ[U]ITTAL, SINCE THE STATE FAILED TO PRESENT ANY EVIDENCE BEYOND REASONABLE DOUBT TO SUSTAIN HIS CONVICTION, THUS VIOLATING HIS RIGHTS UNDER THE DUE PROCESS CLAUSE OF THEFOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, S. 16 OF THE OHIO CONSTITUTION."
 Fourth Assignment of Error
"THE JURY'S VERDICTS OF GUILT BY COMPLICITY TO COMMIT AGGRAVATED ROBBERY AND THEFT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN THIS CASE."
 {¶ 5} In his second assignment of error, Appellant contends that the trial court erred when it denied defense counsel's Crim.R. 29 motion for acquittal, asserting that his convictions for theft and aggravated robbery were not supported by sufficient evidence. In his fourth assignment of error, Appellant contends that the convictions were against the manifest weight of the evidence. We disagree.
 {¶ 6} As a preliminary matter, we observe that sufficiency of the evidence and weight of the evidence are legally distinct issues. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 7} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id. "In essence, sufficiency is a test of adequacy." Thompkins, 78 Ohio St.3d at 386.
 {¶ 8} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 9} Sufficiency of the evidence is required to take a case to the jury; therefore, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id.
 {¶ 10} Appellant was convicted of complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(1), and complicity to commit theft, in violation of R.C. 2913.02. R.C.2923.03(A)(2), complicity, provides, "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]"
 {¶ 11} Aggravated robbery is proscribed as follows:
"(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" R.C.2911.01(A)(1).
 {¶ 12} R.C. 2913.02, theft, states:
"(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
"(1) Without the consent of the owner or person authorized to give consent;
"(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
"(3) By deception;
"(4) By threat;
"(5) By intimidation." See, also, R.C. 2913.01(K)(1).
 {¶ 13} R.C. 2901.22 provides definitions for the requisite mental states pertinent to the theft statute:
"(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
"(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
Because a defendant's mental state is difficult to demonstrate with direct evidence, it may be inferred from the surrounding circumstances in the case. State v. Logan (1979),60 Ohio St.2d 126, 131. Culpable mental states can be established by circumstantial as well as direct evidence. State v. Kincaid,
9th Dist. No. 01CA007947, 2002-Ohio-6116, citing Kreuzer v.Kreuzer, 144 Ohio App.3d 610, 613, 2001-Ohio-1542.
 {¶ 14} If the State relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." State v. Daniels
(June 3, 1998), 9th Dist. No. 18761, at *1, quoting State v.Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value[.]" State v. Smith (Nov. 8, 2000), 9th Dist. No. 99CA007399, at *6, quoting Jenks, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, while inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. State v. Lott (1990),51 Ohio St.3d 160, 168, citing Hurt v. Charles J. Rogers Transp. Co. (1955),164 Ohio St. 329, 331. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusion in a case. Lott, 51 Ohio St.3d at 168, citing Hurt, 164 Ohio St. at 331.
 {¶ 15} The victim in this case, Phyllis P. Ady, testified regarding the incident that occurred on March 18, 2004 at the Family Dollar Store. Ms. Ady was the assistant manager on duty that evening and was working in the back office of the store. Her duties included counting money, putting cashier drawers away, preparing money bags for deposit, and depositing money at the bank each evening. She explained that from the back office one could exit through a back door to an outdoor area behind the building. Ms. Ady confirmed that the Family Dollar Store was located in a strip plaza, and that a drive leads to the back of the store and provides access to the back door of the store. Ms. Ady testified that she knew Appellant because he worked at the store for several months.
 {¶ 16} Ms. Ady testified that around 7:15 p.m., she was in the back office counting the money in a cashier drawer when she heard a knock on the back door. She explained that employees of the store knew that she would automatically answer the door because she was too short to look through the eyehole. Ms. Ady answered the door and saw "[a] guy looking at me like he's a wrestler ready to come at me. * * * He had jeans, [a] shirt, a hooded sweater and a ski mask * * * [, and] had a knife in his hand." Then, Ms. Ady explained,
"I backed up and he came in and I said `What the hell's going on?' And he said `Where's the money b and the next thing I [k]new I was flying in a corner. He hit me, cut the phone lines, hit me again and proceeded to ask me where the safe was and I was so scared I couldn't move so I just went like this with my hands [to indicate the direction of the safe].
"* * *
"* * * And then the third time that he hit me is when I ended up getting the gash in my head and he turned around and bolted out the door."
Ms. Ady stated that the perpetrator had taken money. Once the back door was shut, she pulled herself up and went to the front of the store to tell the employee on duty to call the police. Ms. Ady testified that $906 dollars was missing from the safe after the incident. Ms. Ady was taken to the hospital, where she received seven stitches.
 {¶ 17} Jim Garrett testified on behalf of the State. He testified that he and Appellant were childhood friends, and that on the day in question, they were at a friend's house drinking and smoking marijuana. The two discussed how to obtain more money, and they came up with a plan to rob a Sears store at which Appellant used to work. Appellant and Mr. Garrett left their friend's house and started to drive towards the Sears store in the Chevrolet Lumina that belonged to Appellant's mother; he explained that the car had a dent on the side. Mr. Garrett stated that they changed their minds and that Appellant suggested that they rob the Family Dollar Store because "he also worked there and he said it would be easy." Mr. Garrett explained that Appellant knew where the safe was and knew his way around the store. Appellant instructed him to "just go in, straight to the back, knock on the manager's door and someone will open it up and right there's the safe. Then run out the back door, * * * and [that he'd] be sitting behind Grinders waiting for me."
 {¶ 18} Mr. Garrett further testified that he and Appellant arrived at the plaza, and they went into the store first to look around. Mr. Garrett was wearing a gray Tommy Hilfiger sweatshirt and blue jeans. After approximately five minutes, they left the store and visited other stores in the plaza. They then returned to Appellant's car and confirmed that they would rob the Family Dollar Store. Appellant gave Mr. Garrett gloves and a white surgical mask from his work lunch box, as well as a switchblade knife with a blade approximately five inches in length, as shown in a photograph admitted at trial. Mr. Garrett then walked to the back of the store. He put on the gloves and mask and knocked on the door. Ms. Ady opened the door, and Mr. Garrett testified that the following ensued:
"I ran in there and showed her my knife and said give me all your money and I head butted her and she fell down. I said give me all your money and she pointed to the safe and the money on the table.
I got the money on the table and the safe and I cut the telephone line. My knife broke and I hit her again and I ran out the [back] door[.]"
Mr. Garrett then ran to Appellant's car. They drove off to Appellant's house, laughing. They split the money at Appellant's house.
 {¶ 19} Mr. Garrett testified that he gave the police a written statement about one week later, and that he admitted that he and Appellant were responsible for the events that happened at the Family Dollar Store.
 {¶ 20} On cross-examination, Appellant's counsel attempted to discredit Mr. Garrett's testimony, suggesting that Mr. Garrett was fabricating this story and that it was someone else who executed the robbery with Mr. Garrett that evening. Counsel inquired about individuals named James Gray and Jessica Ray and their possible involvement in the incident. However, counsel's attempt was unsuccessful; Mr. Garrett insisted that Appellant was with him that evening and denied that anyone else was involved in the robbery.
 {¶ 21} An employee of LA Pets Store, David Pittman, testified that on the night in question, he observed Appellant and Mr. Garrett walk into the LA Pets Store. He testified that he kept his eye on them because they exhibited "unusual" behavior, in that they just walked around the store and did not look like they were going to purchase anything. Mr. Pittman saw them exit the store and observed Mr. Garrett walk in the direction of the Family Dollar Store and Appellant walk to a grey car that looked like it had been side swiped and dented. Mr. Pittman saw Appellant drive away in the vehicle and down a roadway that led behind the plaza building.
 {¶ 22} William Detlenko also testified on behalf of the State. Mr. Detlenko testified that he and his two daughters were in the Family Dollar Store in Orrville on the evening in question. He saw Mr. Garrett in the store and said he looked suspicious, as if he was going to shoplift. Also, Mr. Detlenko noted that Mr. Garrett looked surprised when he saw Mr. Detlenko in the store.
 {¶ 23} Patrolman Joshua Hunt from the City of Orrville Police Department testified that he obtained a description of the vehicle from Mr. Pittman who had contacted Patrolman Hunt regarding the incident. Patrolman Hunt recalled seeing Appellant driving a vehicle with the same type of damage in town. The day following the incident, Patrolman Hunt saw the vehicle parked in front of Appellant's residence, and he took photographs of the vehicle. Patrolman Hunt testified that Mr. Pittman confirmed that the vehicle in the photographs was the same vehicle he saw that evening.
 {¶ 24} Special Agent Bill O'Connor of the Bureau of Criminal Investigation testified regarding his interview with Appellant. Agent O'Connor testified that he and Detective Caskey transported Appellant from Quality Castings where Appellant worked to the Orrville Police Department. Appellant had on a surgical mask and big gloves when they met him at Quality Castings. Agent O'Connor testified that he invited Appellant to come to the police station to discuss the incident and that Appellant agreed. Appellant was read his Miranda rights, and he signed a waiver form.
 {¶ 25} Agent O'Connor testified regarding what Appellant relayed regarding the incident: The night of the robbery, Appellant was at Mr. Garrett's house, and Mr. Garrett discussed carrying out a robbery to obtain some "quick money." Appellant stated that this was the extent of their conversation about the robbery. However, Appellant did admit that he had driven himself and Mr. Garrett to the shopping plaza where the Family Dollar Store was located. Appellant stated that they first entered LA Pets, and then returned to the car and drank some beers. They moved the car to behind the Grinders Restaurant, and Appellant observed a mask on Mr. Garrett's lap. Mr. Garrett told him that he was "going to go to the store." Appellant then watched Mr. Garrett get out and walk towards the Family Dollar Store. Several minutes later, Mr. Garrett "came running back directly for the car, running fast, got in the car and [said,] `Get the f out of here.'" Appellant drove away quickly. He noticed that Mr. Garrett had money sitting on his lap and money sticking out of his pockets. While Appellant drove back to his house, Mr. Garrett commented, "`Man I had to head butt her, I tried to cut the phone lines'."
 {¶ 26} Appellant provided a written statement after the interview. On cross-examination, O'Connor read Appellant's written statement, which corroborated that the two had been at the plaza that evening, and that they entered the LA Pets store. Appellant had insisted that he entered the LA Pets to look for fighting fish. However, Appellant testified that they both drove behind the building to Grinders, where they drank beers until Mr. Garrett decided to leave and go to a store. After five to ten minutes, Mr. Garrett ran back from the store, and Appellant
"started leaving but didn't want to leave a friend that set me up for an armed robbery but I did call once as an anonymous caller to tell OPD what he looked like. I thought that might have helped. I knew the women that was assaulted. Her daughter works with my mother. I never had anything to do with this action as it was never planned. I am willing to tell the truth to the right people because I'm an innocent man that was set up by his so called friend. I'm sure the people at Family Dollar know I had nothing to do with that. I'm a working man at Quality Casting does not need to every [sic] steal."
 {¶ 27} Appellant testified on his own behalf. Appellant testified that he only learned of the robbery the next day when his uncle approached him about the incident. He admitted that he entered the LA Pets store but insisted that he did not enter the Family Dollar Store the evening in question. Instead, Appellant said that they both went back to Appellant's car and drove over to an ATM machine across from Grinder's Restaurant where Mr. Garrett withdrew money. He stated that they then drove to the Grinder's parking lot to wait for a female friend to get off of work and drank beer in the parking lot. Appellant explained that after Mr. Garrett returned from the store and they drove off, Mr. Garrett then told him to stop the car, and Mr. Garrett got into a purple Dodge Neon with the license plate "Lil J. Ray" that belonged to a mutual friend Jessica Ray. Appellant asserted that several days later, Mr. Garrett told him he was the robber and offered him money.
 {¶ 28} Appellant also testified that he was willing to take a polygraph test regarding the incident but that the polygraphist refused to administer the test. Trooper Randy Alexander from the Ohio State Highway Patrol, the certified polygraphist that was to conduct the test, testified as a rebuttal witness on behalf of the State. Trooper Alexander stated that based on his training and expertise he determined that he could not administer the polygraph examination on Appellant that day. He explained that Appellant was not fit to take the test because of an "odor of alcohol [on Appellant's person], the fact that he fell asleep once during the background form, his overall appearance, the glassy eyes, the eyes half open, the confusion."
 {¶ 29} Jessica Ray testified on behalf of the defense that on the evening in question, she was waiting at the nearby Pizza Hut where she worked to be picked up after her shift. She waited until about 8:45 p.m., when she observed someone driving her Neon pull into the parking lot, with Mr. Garrett in her car. Appellant also drove up in his own vehicle.
 {¶ 30} The State also recalled Ms. Ady to the stand as a rebuttal witness. She testified that she did see Appellant in the Family Dollar Store around the time that the incident occurred, but she could not confirm whether it was the day of the incident.
 {¶ 31} Based upon our thorough review of the record, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it found Appellant guilty of complicity to commit theft and complicity to commit aggravated robbery. See Otten, 33 Ohio App.3d at 340. Appellant challenges the credibility of Mr. Garrett and insists that other witness testimony establishes that Jessica Ray's vehicle was used as the get-away car, and that someone other than Appellant was the driver of the get-away car.
 {¶ 32} The trial judge instructed the jury in accordance with R.C. 2923.03(D), stating, that, while "Garrett's testimony should be viewed with grave suspicion and weighed with great caution," the weight to be given his testimony was ultimately a matter for the jury to determine. Indeed, the jury was entitled to believe one witness' testimony over that of another. See State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury in this case had the opportunity to view the witnesses' testimony and adjudge their credibility. Therefore, we must give deference to the jurors' judgment, as matters of credibility are primarily for the trier of fact. See State v. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118. Considering the facts and circumstances surrounding the incident, we cannot find that the jury lost its way in finding that Appellant was guilty of complicity to commit aggravated robbery and complicity to commit theft.
 {¶ 33} Accordingly, we find that Appellant's conviction for complicity to commit theft and complicity to commit aggravated robbery was not against the manifest weight of the evidence. Having found that Appellant's conviction was not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the jury's verdict in this case with respect to the offenses. See Roberts, supra.
 {¶ 34} Appellant's second and fourth assignments of error are overruled.
 B. First Assignment of Error
"APPELLANT GAINES' CONVICTION, FOLLOWING INVOLUNTARY TERMINATION OF HIS DEFENSE BY A BIASED TRIAL JUDGE OVER OBJECTION BY COUNSEL, CONSTITUTED ERROR PER SE AND VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, S. 16 OF THE OHIO CONSTITUTION."
 {¶ 35} In his first assignment of error, Appellant contends that he was denied a fair trial because the judge assigned to the case was biased, and requests this Court to reverse Appellant's conviction on this basis. We disagree with Appellant's contention.
 {¶ 36} We observe at the outset that Appellant failed to follow the proper procedure in the trial court to challenge the trial judge based on bias. See R.C. 2701.03. See, generally,Petralia v. Petralia, 11th Dist. No. 2002-L-047, 2003-Ohio-3867, at ¶ 20; State v. Peoples, 5th Dist. No. 2003CA0046, 2003-Ohio-5803, at ¶ 11; State v. Mays (1996),108 Ohio App.3d 598, 611-12; State v. Hunter, 151 Ohio App.3d 276,2002-Ohio-7326, at ¶ 17 (noting that "R.C. 2701.031 * * * provides the exclusive means by which a litigant may claim that a municipal court judge is biased and prejudiced").
 {¶ 37} It is established that a court of appeals does not have the authority or jurisdiction "to render a decision * * * or to void a trial court's judgment on the basis of personal bias or prejudice on the part of the trial judge." (Internal citations omitted.) Hunter at ¶ 18, 21, citing Nicolaci v. Littlejohn
(1989), 55 Ohio App.3d 147, 148, and Beer v. Griffith (1978),54 Ohio St.2d 440, 441-42. See, also, State v. Mathis (Apr. 30, 1997), 9th Dist. No. 96CA006448, at *3. Therefore, we must refrain from addressing this issue, and overrule Appellant's first assignment of error. See Hunter at ¶ 21, 52.
 C. Third Assignment of Error
"THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING INTO EVIDENCE A SECRETLY VIDEOTAPED INTERROGATION OVER APPELLANT'S OBJECTION, VIOLATING HIS RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, S. 16 OF THE OHIO CONSTITUTION."
 {¶ 38} In his third assignment of error, Appellant challenges the trial court's admission into evidence of the videotaped interview that Agent O'Connor had with Appellant after the incident, asserting that it prejudiced his trial. We disagree with Appellant's assertion.
 {¶ 39} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage
(1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, a trial court's decision on an evidentiary issue will stand absent an abuse of discretion that materially prejudices a party. Dardinger v. Anthem Blue Cross Blue Shield,98 Ohio St.3d 77, 2002-Ohio-7113, at ¶ 193, quoting State v. Hymore
(1967), 9 Ohio St.2d 122, 128. An abuse of discretion means more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v.Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 40} After Agent O'Connor testified regarding Appellant's interview, the State sought to have a video-taped recording of the interview admitted into evidence. Defense counsel objected and argued that the State had not provided Appellant with the videotape during discovery. However, counsel also acknowledged receipt of the State's discovery response that included a summary of Appellant's interview with Agent O'Connor as well as an assertion that the interview was videotaped.
 {¶ 41} Counsel also argued that the taped statement was hearsay, to which the court responded to the contrary, that it was an admission made by a party opponent. See Evid.R. 801(D)(2). Counsel later conceded this point.
 {¶ 42} The court overruled defense counsel's objection and admitted the tape into evidence. Later during the trial, defense counsel agreed that the jury should watch the videotape, and stated, "I think that them viewing the tape from what I know about it now is not going to be damaging."
 {¶ 43} Upon review of the video-taped interview, we cannot find that the tape's admission ultimately materially prejudiced Appellant, in light of Agent O'Connor's testimony and other evidence presented and admitted during trial. See Dardinger at ¶ 193; Hymore, 9 Ohio St.2d at 128. Thus, we conclude that the trial court did not abuse its discretion in admitting the tape.
 {¶ 44} Appellant's third assignment of error is overruled.
 III. {¶ 45} Appellant's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Carr, P.J. Moore, J. concur in Judgment Only.