OPINION
{¶ 1} Defendant-appellant, Keon Richardson, appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated murder following a jury trial.
 {¶ 2} On November 23, 2003, 16-year-old James Revere was shot and killed at the intersection of Hayman and Covington Streets on the north side of Youngstown. Appellant, Glenn Scott, and Stephen Breedlove were implicated in the shooting.
 {¶ 3} According to an eyewitness, Revere was spotted driving down Covington. Appellant and his codefendants were seen driving up and down nearby Griffith Street and then eventually the witness spotted them at the corner of Hayman and Covington Streets. Scott was named as the driver with appellant and Breedlove as his passengers. According to the witness, appellant, and at least one other man, opened fire on Revere while he was still in his car. The three then fled the scene.
 {¶ 4} On December 4, 2003, a Mahoning County grand jury indicted appellant by direct presentment, jointly with Scott and Breedlove, on one count of aggravated murder, a first-degree felony in violation of R.C. 2903.01(A)(F) and R.C. 2929.03(A)(1) with a firearm specification in violation of R.C. 2941.146(A).
 {¶ 5} After numerous continuances and several changes in defense counsel, appellant proceeded to a jury trial on October 30, 2006. The jury found appellant guilty as charged. The trial court subsequently sentenced appellant to life in prison, with parole eligibility after 20 years, for the aggravated murder and five years of actual incarceration on the firearm specification to be served prior to and consecutive to the aggravated murder sentence.
 {¶ 6} Appellant filed a timely notice of appeal on November 22, 2006.
 {¶ 7} Appellant raises five assignments of error, the first of which states:
 {¶ 8} "THE TRIAL COURT ERRED IN PERMITTING HEARSAY EVIDENCE IN VIOLATION OF THE UNITED STATES CONSTITUTION AMEND. VI AND XIV AND OHIO CONSTITUTION ART. I § 10."
 {¶ 9} Appellant argues that the trial court should not have permitted *Page 2 
testimony by Sholanda Bohazi Hammond regarding a phone call she received by Revere.
 {¶ 10} Hammond testified that just prior to the shooting, Revere called her from "some dude's house." (Tr. 408). Hammond stated that Revere told her that appellant, Scott, and Breedlove were following him. (Tr. 407). She stated that he sounded scared. (Tr. 406). Hammond also stated that Revere told her that he had been "hitting corners," or making turns, to try to lose them. (Tr. 407). Appellant objected to this testimony.
 {¶ 11} Appellant argues that Hammond's testimony was hearsay. He asserts it did not fall under the "excited utterance" exception to the hearsay rule, as appellee, the State of Ohio, argued. Appellant argues that when Revere called Hammond, he was not in the midst of a startling event. Instead, appellant argues, Revere was safe at "some dude's house." Appellant argues that the mere fact that Revere was upset or agitated was not enough to qualify his statements to Hammond as excited utterances. He further contends that we have no idea how long Revere had been at this house before calling Hammond.
 {¶ 12} A trial court has broad discretion in determining whether to admit or exclude evidence and its decision will not be reversed absent an abuse of discretion. State v. Mays (1996), 108 Ohio App.3d 598, 617,671 N.E.2d 553. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157, 404 N.E.2d 144.
 {¶ 13} Hearsay is an out-of-court statement, offered in court, to prove the truth of the matter asserted. Evid.R. 801(C). Generally, hearsay is inadmissible. Evid.R. 802. However, there are numerous exceptions to the hearsay rule.
 {¶ 14} One of those exceptions is for "excited utterances." An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). In order for an excited utterance to be admissible, four requirements *Page 3 
must be met: (1) there must be a startling event that produces nervous excitement in the declarant so that his statement is spontaneous and non-reflective; (2) the declarant must make the statement while he or she is still under the stress of the excitement; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. State v. Taylor (1993),66 Ohio St.3d 295, 300-301, 612 N.E.2d 316, citing Potter v. Baker (1955), 162 Ohio St. 488, 124 N.E.2d 140, at paragraph two of the syllabus.
 {¶ 15} Before allowing Hammond to testify as to Revere's statement, the trial court conducted an extensive inquiry out of the jury's presence. During this inquiry, the prosecutor and defense counsel questioned Hammond about the circumstances surrounding Revere's call. Hammond testified to the following.
 {¶ 16} In the week preceding his death, Revere received a message on his pager. (Tr. 380). Revere played the message for Hammond. (Tr. 380). She recognized the voice on the message as belonging to Breedlove. (Tr. 381). In the message, the man Hammond identified as Breedlove threatened to kill Revere. (Tr. 382).
 {¶ 17} Hammond further testified that on the day Revere was killed, she received a phone call from him. (Tr. 382-83). She stated that during the call, Revere sounded "scared; frightened; shook up." (Tr. 383). He told Hammond that he was at "some dude's house." (Tr. 383). He told Hammond that appellant, Breedlove, and Scott had been following him and he had been trying to lose them. (Tr. 383). Revere stated that he could not lose them so he went to the "dude's" house and called Hammond. (Tr. 383). Revere told Hammond that he was scared and did not know what to do. (Tr. 384).
 {¶ 18} Hammond stated that the entire phone call lasted less than five minutes. (Tr. 385). She testified that "[i]t was more or less like a rushed conversation. He was so excited. It was just like he was blabbering on." (Tr. 385). Hammond further testified that Revere had been at her house just 15 to 20 minutes prior to making the phone call. (Tr. 385-86). She also testified that she believed that *Page 4 
he was safe in the house that he made the call from. (Tr. 386). And she stated that while Revere felt safe there, he was still scared and nervous. (Tr. 394).
 {¶ 19} Based on this testimony, the court determined that Revere's statement was an excited utterance because it was reactive and not reflective. (Tr. 403-404).
 {¶ 20} Appellant argues that the court should not have admitted Revere's statement to Hammond because of the timing element. Appellant contends that Revere was not in the midst of a startling event when he made the statement to Hammond, but instead had time to reflect on his statement.
 {¶ 21} As to the timing requirement of the excited utterance exception, "[t]here is an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence of the event are more trustworthy than statements not uttered at or near the time of the event." State v. Ellington, 8th Dist. No. 84014, 2004-Ohio-5036, at ¶ 10. However, "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance" as long as the declarant is still under the stress of the startling event when he makes the statement. Taylor,66 Ohio St.3d at 303.
 {¶ 22} Revere was still under the stress of being followed by appellant, Breedlove, and Scott when he made the statement to Hammond that those three men were following him. The evidence demonstrated that in the week preceding, Breedlove left Revere a death threat. Revere then found himself being followed by the person who had recently threatened his life, along with appellant and Scott. Revere tried to lose them but was unsuccessful. So he stopped at "some dude's" house and called his friend, Hammond. He was "scared," "frightened," "shook up," "excited," and "blabbering on." His entire conversation lasted less than five minutes and was "rushed." Furthermore, Revere had only been gone from Hammond's house for 15 to 20 minutes before he called her. Thus, the longest amount of time that could have passed between when he was being followed (the startling event) and when he called Hammond (the excited statement) was 20 minutes. Presumably, much less time than that passed because Revere was followed and tried to lose his *Page 5 
pursuers before stopping and calling Hammond.
 {¶ 23} Based on this evidence, it was reasonable for the trial court to conclude that Revere was still in an excited state when he called Hammond. Thus, the court did not abuse its discretion in permitting Hammond to testify as to Revere's phone call to her and to his statement that appellant, Breedlove, and Scott were following him. Accordingly, appellant's first assignment of error is without merit.
 {¶ 24} Appellant's second assignment of error states:
 {¶ 25} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THEFOURTEENTH AMENDMENT DUE TO THE FACT THAT THE TRIAL COURT PERMITTED INTRODUCTION OF UNRELIABLE EYEWITNESS IDENTIFICATION."
 {¶ 26} Here appellant argues that the trial court should not have allowed the eyewitness identification of him by Kenneth Findley and Anita Marshall. As to Findley, appellant asserts that Findley testified that he knew appellant and that Findley did not see appellant at the murder scene. As to Marshall, appellant asserts that her testimony demonstrated that she was not close enough to identify those involved. He points out that Marshall's testimony indicated that she was focused on the car driven by the victim and on her sister. Yet she was unable to identify the victim initially. Furthermore, appellant points out that Marshall did not stay at the scene to tell police who was involved with the shooting. Instead, Marshall called Hammond to inform her of the shooting. Appellant contends that this conversation with Hammond could have influenced Marshall's identification of him.
 {¶ 27} As this assignment of error deals with whether the trial court properly admitted certain evidence, it too will be reviewed for abuse of discretion. Mays, 108 Ohio App.3d at 617.
 {¶ 28} As to Findley's identification, Findley testified that he was traveling on Covington on the day of the shooting when he heard gunshots. (Tr. 237-38). He stopped and noticed two cars that were involved in the gunfire. (Tr. 239). Findley noticed a black man get out of the backseat of one of the cars and open fire on the other car. (Tr. 241-42). Findley then saw the man get back in the car and the car *Page 6 
drove away. (Tr. 243). Findley stated that there were three people in the car, but he was unable to identify any of them. (Tr. 244). Later, he testified that he picked out Breedlove and appellant from photo lineups. (Tr. 247-51). However, he specified that he did so only because he knew them and the detective asked him to identify anyone that he knew. (Tr. 247-51). Appellant did not object to this statement. Findley expressly testified that he did not notice appellant at the murder scene. (Tr. 250). He stated that he was worried for his own safety at that point. (Tr. 251).
 {¶ 29} Findley clearly testified that the only reason he picked appellant out of a photo lineup was because he knew appellant. And he also stated that he did not see appellant at the murder scene. This testimony would seem to help appellant's case rather than hurt it. Furthermore, appellant did not object to this testimony. His failure to object to the testimony in question waives all but plain error. Appellant has pointed to no reason why the court should have excluded Findley's identification of him especially in light of the fact that Findley stated that he did not notice appellant at the murder scene.
 {¶ 30} As to Marshall's identification, appellant argues that it was unreliable. Marshall testified that on the day of the shooting she was outside at her sister's apartment on Griffith Street. (Tr. 308). Her sister, Arielle Brown, and some other girls were also present. (Tr. 308). Marshall testified that she saw a burgundy four-door car drive slowly up and down Griffith. (Tr. 309, 313-14). In the car, Marshall identified Scott driving, Breedlove in the passenger seat, and appellant in the back seat. (Tr. 309-310). She stated that it was unusual for those three men to be near Griffith due to feuds in the area between the men in the car and others who hung out in that area. (Tr. 310). Marshall stated that she made eye contact with the men in the car. (Tr. 312, 314). She also stated that she knew appellant, along with Breedlove and Scott, from school and from the neighborhood. (Tr. 312-13). And Marshall stated that the men looked at her and she was able to get a good look at all three of them. (Tr. 314-15).
 {¶ 31} Marshall testified that she also saw another car that she recognized *Page 7 
drive down Covington. (Tr. 315-16). This car belonged to Sholanda Bohazi Hammond. (Tr. 319). She stated that Brown first noticed the car and pointed it out. (Tr. 316). According to Marshall, Brown thought that Raymond Hammond, her ex-boyfriend was driving this car. (Tr. 317). Marshall did not see who was in this car, but she believed Brown when she said it was Raymond Hammond. (Tr. 318). Marshall stated that Brown took off running after the car she believed Raymond Hammond was driving and Marshall ran after her. (Tr. 318). Marshall stated that she stopped on the Covington bridge, where she had a good view of both cars. (Tr. 319-20).
 {¶ 32} Marshall then heard gunshots. (Tr. 320). She testified that she saw appellant and Breedlove shooting. (Tr. 321). She stated that appellant was firing from the back seat and Breedlove was firing from the front passenger seat. (Tr. 321). At that point in time, Marshall still thought that Raymond Hammond was in the other car. (Tr. 322).
 {¶ 33} Marshall then saw appellant and Breedlove exit the car they were riding in. (Tr. 324). She stated that appellant walked towards the car that Revere was in while shooting at the car, which was backed up onto Hayman Street. (Tr. 324). She stated that she saw appellant then get back into the car and the car took off. (Tr. 327). Marshall stated that she was able to see this entire incident. (Tr. 325).
 {¶ 34} Marshall then identified appellant as the man that she saw shooting into Hammond's car. (Tr. 329).
 {¶ 35} Appellant did not object during this entire line of questioning.
 {¶ 36} Marshall next testified that after the shooting, she went to Hammond's vehicle and saw that it was Revere, not Raymond Hammond, who was in the car. (Tr. 330). Next, Marshall stated that she left the scene and called Sholanda Bohazi Hammond. (Tr. 331). She stated that she did not stay at the scene to talk to police. (Tr. 331-32). Marshall stated that she did not want to get involved. (Tr. 332).
 {¶ 37} Marshall testified that Detective Daryl Martin later came to her house. (Tr. 332). Detective Martin showed Marshall two photo lineups. (Tr. 335). In one *Page 8 
lineup she identified appellant and in the other she picked out Scott. (Tr. 335). She stated that she picked appellant and Scott out because they were involved in the incident she saw. (Tr. 335). Marshall again reiterated that she picked appellant from the photo lineup because she saw him shooting from the backseat at Revere. (Tr. 337-38).
 {¶ 38} On cross examination, Marshall stated that her mind was on her sister at the time of the shooting. (Tr. 357). She also stated that she called Hammond after the incident to tell her that Revere was just shot in her car. (Tr. 363). Additionally, she stated that in the photo array containing appellant's picture, she knew two of the other people. (Tr. 367-68).
 {¶ 39} Appellant failed to object to Marshall's identification of him. Thus, once again, he has waived all but plain error.
 {¶ 40} The admission of Marshall's identification of appellant was not plain error. The reasons appellant points to in support of excluding Marshall's testimony, i.e., she was concentrating on her sister, she was not close enough to the scene, she did not go to the police, she spoke to Hammond right after the shooting, all go to Marshall's credibility. Issues of witness credibility are best left to the trier of facts.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. It was up to the jury to take these circumstances into consideration when determining what weight to give to Marshall's testimony. The jurors were able to consider such things as whether Marshall paid sufficient attention to the shooters given the fact that she was concerned for her sister and why Marshall did not stay at the scene to tell police what she had witnessed. The jurors were then able to take these considerations into account when deciding whether to believe Marshall's statement that appellant shot Revere. Thus, the trial court did not err in allowing Marshall to give testimony identifying appellant.
 {¶ 41} Accordingly, appellant's second assignment of error is without merit.
 {¶ 42} We will address appellant's fourth assignment of error next for ease of discussion. It states: *Page 9 
 {¶ 43} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THEFOURTEENTH AMENDMENT IN THAT HIS CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED."
 {¶ 44} Appellant asserts here that the jury's verdict was against the manifest weight of the evidence. Appellant bases this claim on his misinterpretation that Findley's testimony firmly establishes that he was not at the scene. As already discussed, Findley testified that he was unable to identify any of the shooters and he did not notice whether appellant was at the scene. For added support, appellant also claims Marshall's identification of him was unreliable.
 {¶ 45} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 46} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.DeHass, 10 Ohio St.2d at paragraph one of the syllabus.
 {¶ 47} The jury convicted appellant of aggravated murder in violation of R.C. 2903.01(A), which provides in part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another," and a firearm specification.
 {¶ 48} In addition to the testimony by Marshall and Findley set out above, the two also testified to the following. *Page 10 
 {¶ 49} Findley testified that he heard approximately ten to fifteen gunshots fired after he saw one of the shooters get out of the car. (Tr. 242). He stated that this shooter exited the car from the backseat. (Tr. 242). After this shooter fired the shots, Findley testified that the shooter got back in the car he was riding in and the car left the scene. (Tr. 243). Findley stated that this car contained three people-one in the driver's seat, one in the front passenger seat, and one in the back seat. (Tr. 243). Findley stated that he was not able to identify any of the people in the car. (Tr. 244).
 {¶ 50} In addition to her previously discussed testimony, Marshall testified that after the gunfire stopped, she saw someone drop a Black Mild cigar and a lighter at the scene. (Tr. 326). However, she was not sure who dropped it. (Tr. 326). Marshall stated that it was either appellant or Breedlove. (Tr. 371). She stated that this was a sign of disrespect to the victim's mother. (Tr. 327). Additionally, Marshall testified that there was a feud between two families, the Scotts and the Hammonds. (Tr. 371). Marshall stated that appellant associated himself with the Scotts while Revere associated himself with the Hammonds. (Tr. 371).
 {¶ 51} The state also called several other witnesses who testified as follows.
 {¶ 52} Sholanda Bohazi Hammond testified, as discussed above, that Revere called her just before the shooting and told her that appellant, Scott, and Breedlove were following him and that he had been trying to lose them. (Tr. 406-409). She also stated that when she went to the scene, she noticed a Black Mild cigar and a lighter near some bullet shells. (Tr. 409-410).
 {¶ 53} Robert Mauldin, a Youngstown Police Department crime lab technician, testified that he arrived on the scene to collect evidence. (Tr. 433-34). He stated that he recovered eleven 9mm shell casings, nine .380 shell casings, and a cigar and lighter, among other things, from the crime scene. (Tr. 443). He also testified that several shell casings were found inside Revere's car. (Tr. 446-48).
 {¶ 54} Jon Gardner, a forensic scientist in the firearm section of the Ohio Bureau of Criminal Identification and Investigation (BCI), testified that all eleven 9mm *Page 11 
casings were fired from the same weapon. (Tr. 482). And he testified that all nine .380 casings were fired from the same weapon. (Tr. 483). Thus, he concluded that a minimum of two guns were used at the crime scene. (Tr. 488).
 {¶ 55} Dr. Robert Belding, the deputy coroner, testified that Revere's cause of death was hypovolemic shock due to gunshot wounds to the torso. (Tr. 516-17). He also testified that the manner of Revere's death was a homicide. (Tr. 517).
 {¶ 56} Detective Martin testified that he too noticed the cigar and lighter at the crime scene. (Tr. 528). He also testified regarding his conversation with Marshall. Detective Martin stated that he showed Marshall a photo array with appellant's picture in it and that she picked him out as being one of the shooters. (Tr. 532, 537). He stated that after his conversation with Marshall, he determined that appellant was a suspect in the shooting. (Tr. 533). Furthermore, Detective Martin testified that he was present when a DNA sample was collected from appellant. (Tr. 535-36).
 {¶ 57} Finally, Melissa Zielaskiewicz, a forensic scientist in the DNA serology section at BCI, testified. Zielaskiewicz stated that she received DNA samples from appellant, Breedlove, Scott, and Revere. (Tr. 559). She stated that she also received a cigar as an evidence sample. (Tr. 560). Zielaskiewicz testified that the DNA on the cigar matched appellant's DNA because the chances of the DNA found on the cigar belonging to someone other than appellant was one in one hundred and forty-three billion, four hundred million. (Tr. 568-69).
 {¶ 58} Given this testimony, the jury's verdict was not against the manifest weight of the evidence. Marshall, an eyewitness, identified appellant as being one of the men who shot Revere. In fact, she stated that appellant exited the car that he was riding in and shot into Revere's car. Marshall had ample opportunity to observe appellant as the car he was riding in drove by Marshall twice and she made eye contact with him. Furthermore, Marshall knew appellant and his cohorts, making her identification more reliable. Additionally, Findley testified that the man in the back seat of the shooters' car was the one who got out of the car and fired shots at close range into Revere's car. Marshall testified that appellant was the man in the *Page 12 
backseat. And although Findley was not able to identify appellant as a shooter, he testified that he was concerned with his own safety at the time, which could explain why he did not get a good look at the shooters.
 {¶ 59} Furthermore, Marshall testified that she saw either appellant or Breedlove drop a cigar and a lighter at the scene. Police officers testified that a cigar and lighter were recovered. DNA found on the cigar matched appellant's DNA, thus firmly placing appellant at the scene.
 {¶ 60} Additionally, Hammond testified that just prior to the shooting Revere called her and told her that appellant, Scott, and Breedlove were following him and that he was scared. This demonstrated that appellant acted with prior calculation and design.
 {¶ 61} Finally, Dr. Belding testified that Revere's death was a homicide caused by a gunshot wound to the torso.
 {¶ 62} Based on the weight of the evidence, we cannot conclude that the jury clearly lost its way in finding appellant guilty of aggravated murder. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 63} Appellant's third assignment of error states:
 {¶ 64} "APPELLANT'S CONVICTION AND SENTENCE ARE IN VIOLATION OF THE UNITED STATES AND OHIO CONSTITUTION BECAUSE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY U.S. CONST., AMEND. VI
AND XIV; OHIO CONST., ART. I, §§ 1, 2, 10 AND 16."
 {¶ 65} Appellant argues that his counsel was ineffective for two reasons: (1) failing to file a pretrial motion to suppress Marshall's identification of him; and (2) failing to make a Crim.R. 29 motion for acquittal at the close of the state's case.
 {¶ 66} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, *Page 13 80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 67} Appellant bears the burden of proof on the issue of counsel's effectiveness. State v. Calhoun (1999), 86 Ohio St.3d 279, 289,714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. Id.
 {¶ 68} As to the first reason, appellant points out that Marshall testified that she was far enough away from the murder scene that she could not tell who the victim was. He notes that Marshall initially thought it was Raymond Hammond driving Sholanda Bohazi Hammond's car. When the police showed her the photo array, appellant notes that Marshall had already spoken with Hammond, who could have influenced her identification of him. And appellant contends that the photo array was suggestive because Marshall knew several people in it. For these reasons, appellant argues that his counsel should have filed a pre-trial motion to suppress Marshall's identification of him.
 {¶ 69} As discussed above, the trial court properly allowed Marshall to give testimony identifying appellant. The issues appellant raises go to Marshall's credibility and do not affect the admissibility of her identification testimony.
 {¶ 70} Appellant additionally argues here that because the photo array with his picture also contained photographs of two other people Marshall knew, it was improper. However, it is unlikely that this affected Marshall's identification of him. Marshall was not picking a stranger out of the photo lineup. She knew appellant from school and from the neighborhood. Thus, she knew who she was looking for in the photo array. The case might be different if Marshall did not know appellant. If that were the case, then it could be argued that Marshall automatically eliminated the two people she knew from consideration when looking at the photo array. *Page 14 
 {¶ 71} For these reasons, appellant's counsel was not ineffective for failing to file a motion to suppress Marshall's identification of him.
 {¶ 72} As to the second reason, appellant argues that the evidence was insufficient to support his conviction given that Findley testified that appellant was not at the scene, that Marshall's identification of him was unreliable, and nobody otherwise connected him to the murder. Thus, he contends his counsel should have filed a motion for acquittal on his behalf.
 {¶ 73} This court has stated: "Counsel has no duty to make fruitless motions. A motion for acquittal deals with sufficiency of the evidence and the test is thus whether the state set forth adequate evidence so that a reasonable person could find the elements proven beyond a reasonable doubt." State v. Stragisher, 7th Dist. No. 03-CO-13,2004-Ohio-6797, at ¶ 76. Thus, in this case, if the state presented sufficient evidence on which a reasonable person could have found all of the elements of aggravated murder, then a motion for acquittal would have been fruitless. Hence, appellant's counsel would not have been ineffective for failing to make such a motion.
 {¶ 74} As addressed in appellant's fourth assignment of error, the state presented evidence going to each and every element of aggravated murder. In fact, the jury's verdict is supported by not only the sufficiency of the evidence, but also the weight of the evidence. Therefore, a Crim.R. 29 motion for acquittal would have been fruitless. Hence, counsel was not ineffective for failing to make such a motion.
 {¶ 75} Accordingly, appellant's third assignment of error is without merit.
 {¶ 76} Appellant's fifth assignment of error states:
 {¶ 77} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR DISCHARGE FOR VIOLATIONS OF SPEEDY TRIAL."
 {¶ 78} In his final assignment of error, appellant argues that he was denied his right to a speedy trial. However, appellant makes no argument supporting this assignment of error other than to state that he never signed a waiver of speedy trial.
 {¶ 79} Appellant states in his brief that he filed a motion for discharge on *Page 15 
September 29, 2004. However, this motion does not appear on the docket. But before voir dire began, appellant's counsel noted for the record that appellant had filed a pro se motion for dismissal for lack of a speedy trial. (Tr. 11). Counsel waived argument on that motion. (Tr. 11). The court stated that it had not seen the motion and counsel indicated that it was a recent filing. (Tr. 11). The court stated that based on the history of the case, the motion was overruled. (Tr. 11-12). This is important because an appellant cannot raise a speedy trial issue for the first time on appeal. Worthington v. Ogilby (1982),8 Ohio App.3d 25, 455 N.E.2d 1022, paragraph two of the syllabus.
 {¶ 80} Every person who is charged with an offense for which he may be deprived of his liberty or property is entitled to the fundamental right of a speedy trial. State v. Dunlap, 7th Dist. No. 01-CA-124, 2002-Ohio-3178, at ¶ 10. This is so because the right to speedy trial "`is premised upon the reality that fundamental unfairness is likely in overlong prosecutions.'" State v. Anderson, 7th Dist. No. 02-CO-30, 2003-Ohio-2557, at ¶ 13, quoting Dickey v. Florida (1970), 398 U.S. 30,54, 90 S.Ct. 1564, 26 L.Ed.2d 26.
 {¶ 81} Pursuant to R.C. 2945.71(C)(2), the state must bring a person charged with a felony to trial within 270 days after his arrest. If the accused is held in jail in lieu of bail on the pending charge, then each day he is held in jail counts as three days. R.C. 2945.71(E). This is known as the "triple-count" provision.
 {¶ 82} The time for speedy trial begins to run when an accused is arrested; however, the actual day of the arrest is not counted.State v. Szorady, 9th Dist. No. 02-CA-008159, 2003-Ohio-2716, at ¶ 12. Appellant was indicted on December 4, 2003 and arrested on December 5. Thus, his speedy trial time began to run on December 6, 2003. Additionally, appellant was held in jail the entire time he was awaiting trial. Thus, the state had to bring him to trial within 90 days.
 {¶ 83} The trial court initially set appellant's trial for January 14, 2004. No tolling events occurred prior to this date. When January 14 arrived, appellant moved for a continuance, which the court granted on January 15. The court set a pre-trial *Page 16 
for January 29. At this point, 41 days on appellant's speedy trial clock had elapsed.
 {¶ 84} On January 29, 2004, the court sua sponte continued the matter because it was involved in a criminal jury trial. The court set appellant's trial for February 23.
 {¶ 85} On February 18, 2004, appellee requested a continuance in order to conduct DNA testing on the cigar found at the scene. The court granted this motion and set the trial for March 15.
 {¶ 86} On March 11, 2004, appellant requested a continuance. He stated that appellee had provided him with the DNA evidence and he wished to obtain an independent DNA review. The court granted appellant's motion and set the case for a pre-trial on March 31.
 {¶ 87} On March 17, 2004, appellant filed a pro se motion to discharge his counsel and asked the court to appoint new counsel. Appellant's counsel subsequently filed a motion to withdraw. The court granted the motions and appointed appellant new counsel on April 1. It also scheduled a pre-trial for April 28.
 {¶ 88} In the meantime, appellant filed a motion asking that the court sever his trial from Scott's trial. At the April 28, 2004 pre-trial, the court granted appellee 14 days to file a motion for joinder. It then reset the pre-trial for May 26, and also determined that it would rule on appellant's motion to sever at that time.
 {¶ 89} On May 26, 2004, the court held the pre-trial where appellant requested a continuance of trial until the independent DNA analysis was completed. The court set the next pre-trial for June 30.
 {¶ 90} At a June 25, 2004 pre-trial, appellant joined in a motion to suppress filed by Breedlove. The court set that matter for hearing on July 26. The court noted that appellant's speedy trial time was tolled pending the hearing on the suppression motion and pending the completion of the independent DNA testing requested by appellant.
 {¶ 91} On July 26, 2004, appellee requested that the court continue the motion to suppress hearing. The court rescheduled it for September 7. On *Page 17 
September 7, the court continued the hearing because it determined that it would take longer than the time allotted. The court reset the hearing for October 29. When the hearing date arrived, appellant withdrew his joinder in Breedlove's suppression motion. Thus, the court canceled the suppression hearing as it pertained to appellant. Appellant's request for continuance for the independent DNA testing was still tolling his speedy trial clock during this time.
 {¶ 92} On November 8, 2004, appellant filed a motion to continue a November 10 hearing because he was still awaiting the DNA test results. The court granted the motion and set the trial for December 6.
 {¶ 93} On December 6, 2004, the court set the trial for January 19, 2005, "[u]pon agreement of the parties" and due to the DNA results still not being completed.
 {¶ 94} On January 19, 2005, appellant once again advised the court that he had not yet received the independent DNA results. He orally requested a continuance, which the court granted. It set the trial for February 16.
 {¶ 95} On February 10, 2005, appellant informed the court at a pre-trial that the lab results were completed. The court then set the trial for March 21.
 {¶ 96} On March 16, 2005, appellant filed a motion for a continuance. For cause, appellant's counsel stated that his wife was hospitalized with a serious infection and it required that he take time off from work. The court granted the motion and reset the trial for April 4.
 {¶ 97} On March 30, 2005, appellant again filed a motion for a continuance. For cause, his counsel stated that his wife's condition had not improved and that he was unsure when he would be able to resume work on appellant's case. He requested a continuance or asked that he be permitted to withdraw. The court granted counsel's motion to withdraw, appointed appellant new counsel, and continued the trial. It set the trial for May 2.
 {¶ 98} On May 2, 2005, appellant orally moved to continue the trial. The court granted the motion. *Page 18 
 {¶ 99} On May 18, 2005, appellant appeared with counsel at a pre-trial and consented to the court setting trial for August 15.
 {¶ 100} On August 15, 2005, due to a medical emergency in appellant's counsel's family and "without objection" by appellant, the court sustained appellant's oral motion to continue. It set the trial for January 9.
 {¶ 101} On December 1, 2005, without further explanation, the court relieved appellant's counsel of his duties. The court then appointed new counsel for appellant. Upon counsel's oral motion and with appellant's consent, the court continued the trial and set the matter for a pre-trial on January 27, 2006.
 {¶ 102} At the January pre-trial, appellant's new counsel moved to continue the trial so that he could prepare. With appellant's consent, the court set the trial for April 24, 2006.
 {¶ 103} On April 21, 2006, appellant requested another continuance to prepare for trial. The court sustained the motion and subsequently set the trial for July 17.
 {¶ 104} On July 17, 2006, appellant filed a motion to continue, this time stating that certain DNA witnesses were unavailable for at least the next four weeks. Appellant then filed a supplemental motion to continue stating that new evidence had just come to light, which required further research. The court granted the motion. In its judgment entry the court noted that appellant appeared in court and agreed that a continuance was necessary. The court then set the trial for October 30.
 {¶ 105} It was on that date, October 30, 2006, that appellant's trial began.
 {¶ 106} During the entire time from January 14, 2004 until his trial began, appellant's speedy trial time was tolled. Thus, only 41 days elapsed from the date appellant was arrested.
 {¶ 107} Nearly all of the continuances were requested by or consented to by appellant. In fact, the trial was continued for almost an entire year waiting on appellant's independent DNA test results. The period of any continuance granted on *Page 19 
the accused's own motion, tolls the speedy trial time. R.C. 2945.72(H). Furthermore, these motions for continuances were all made for matters of trial preparation such as providing new counsel adequate time to prepare, securing witnesses, and conducting independent DNA testing. Thus, even if appellant had not consented to the continuances and time waivers filed by his counsel, they would still toll his speedy trial time. The right to trial within the time limits set forth in R.C.2945.71 can be waived by defense counsel for reasons of trial preparation and the defendant is bound by the waiver even if the waiver was made without his consent. State v. Stanley, 7th Dist. No. 03-MA-42,2004-Ohio-6801, at ¶ 30, citing State v. McBreen (1978),54 Ohio St.2d 315, 320, 376 N.E.2d 593.
 {¶ 108} The remaining continuances were all reasonable and can be accounted for as follows. Twice, the trial court sua sponte continued the trial — once because it was involved in another criminal trial and once because it had not allotted enough time for a hearing on one of appellant's motions. Both times the delay was less than one month. R.C.2945.72(H) allows for the tolling of an accused's speedy trial time upon the issuance of a sua sponte continuance by the trial court as long as the continuance is reasonable. State v. Barker, 6th Dist. No. L-01-1290,2003-Ohio-5417, at ¶ 18. On one occasion, both appellant and the state requested a continuance together. Joint motions for continuance toll an accused's speedy trial time. State v. Davis (Jun. 30, 1999), 7th Dist. No. 98-CA-97. And on another occasion, the state requested a continuance to conduct DNA testing on the cigar found at the scene. This continuance was less than one month. A continuance for testing that may exculpate a defendant, such as DNA testing, is reasonable, even when not on the defendant's own motion. State v. High (2001), 143 Ohio App.3d 232, 243,757 N.E.2d 1176.
 {¶ 109} Based on all of the above, the state brought appellant to trial well within the 90-day speedy trial time. Accordingly, appellant's fifth assignment of error is without merit.
 {¶ 110} For the reasons stated above, the trial court's judgment is *Page 20 
hereby affirmed.
Waite, J., concur.
 DeGenaro, P.J., concur. *Page 1